FILED
United States Court of Appeals
Tenth Circuit

October 22, 2025

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

S.J.B.,

    Plaintiff - Appellant,

v.

COMMISSIONER, SSA,

    Defendant - Appellee.

No. 24-1291
(D.C. No. 1:23-CV-01953-KAS)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **BACHARACH**, **CARSON**, and **ROSSMAN**, Circuit Judges.

_____

S.J.B.[1] appeals from the district court's decision upholding the denial of her application for disability insurance benefits. Exercising jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] The District of Colorado's local rules provide that "[a]n order resolving a social security appeal on the merits shall identify the plaintiff by initials only." D.C.COLO.LAPR 5.2(b). We do not have a corresponding rule, but we will use that convention throughout this Order and Judgment.

## I.  Background

S.J.B. applied for benefits in June 2018, alleging disability beginning May 1, 2018, based on several physical and mental impairments.  Her date last insured was September 30, 2021; thus, she had the burden of proving she was disabled within the meaning of the Social Security Act on that date or before.  *See Henrie v. Dep't of Health & Hum. Servs.*, 13 F.3d 359, 360, 361 (10th Cir. 1993) (holding the claimant must prove she was disabled "prior to the time her insured status expired").  An Administrative Law Judge ("ALJ") twice denied S.J.B.'s application.  S.J.B. appealed those decisions, and the district court remanded each time.  After the second remand, a new ALJ held a de novo hearing and issued a decision in May 2023.  The SSA Appeals Council denied S.J.B.'s request for review, thereby rendering the May 2023 decision the final agency decision for judicial review.  *See Wall v. Astrue*, 561 F.3d 1048, 1051 (10th Cir. 2009) (once the Appeals Council denies request for review, "the ALJ's decision stands as the [SSA's] final decision for purposes of appeal").

### A.  Medical Records and Other Evidence

S.J.B. only challenges the ALJ's evaluation of her digestive impairments, urinary incontinence, and lower back impairment as it relates to the medical need for assistive devices.  We therefore focus only on the evidence pertaining to those impairments.

**Digestive Impairments.**  S.J.B. was initially diagnosed with Crohn's disease in 2016.  In May 2018, she reported her symptoms were controlled with Humira, a

medication used to reduce inflammation. She reported some abdominal pain but denied nausea, vomiting, diarrhea, or constipation. A colonoscopy later that month revealed findings consistent with colitis but no significant active disease.

In July 2018, S.J.B. began seeing a new gastroenterologist, Dr. Michael J. Baker, who noted the possibility of overlapping irritable bowel syndrome but continued S.J.B. on the same treatment regimen. She continued to report stable symptoms through late 2018, but in early 2019 she reported increased symptoms, and a colonoscopy showed active Crohn's disease. Dr. Baker therefore started S.J.B. on a steroid and completed paperwork indicating her symptoms would limit her ability to sit, stand, walk, and lift; would frequently interfere with her attention and concentration; and would result in her missing work more than three days per month. Her symptoms improved with the steroid, and by August 2019, she was doing well overall with her Crohn's disease.

In March 2020, S.J.B. had a colonoscopy that showed normal findings, and in summer 2020, abdominal imaging showed no active inflammatory disease. In October of that year, however, she reported increased abdominal pain and diarrhea symptoms after having stopped using Humira earlier in the year due to eczema. The eczema persisted after she stopped using Humira, so she elected to restart it.

S.J.B. reported no change in her symptoms for the next ten months. In August 2021, she was taking Humira weekly and a daily dose of mesamaline (another anti-inflammatory medication) to treat her symptoms. That same month, she reported to Dr. Baker that she tapered off the steroid in December 2020 but had developed

3

abdominal pain and diarrhea starting in May 2021.  A physician assistant in Dr. Baker's office stated it was difficult to say if S.J.B. was experiencing a Crohn's-related flare or visceral hypersensitivity.  The physician assistant continued S.J.B. on the Humira and mesalamine.

**Urinary Incontinence.**  S.J.B. reported urinary incontinence to her primary care physician in 2018 and 2019.  In August 2020, she met with a urologist and reported having to wear a diaper that she changed four to five times a day.  As part of her treatment, she logged her urinary frequency for two days, and the log reflects she changed her bladder pad two to three times in an eight-hour period.  A subsequent cystoscopy performed in November 2020 was unremarkable.  Although S.J.B. continued to take medication for incontinence, the medical record reflects no further follow-up with the urologist through her last insured date.

**Lower Back Impairment.**  S.J.B. reported lower back pain and ambulation difficulties to her rheumatologist in May 2018.  She described a sudden onset of pain in her lower back, hips, and legs.  Her doctor prescribed a muscle relaxer and referred S.J.B. for physical therapy and pain management.  S.J.B. later reported some benefit from treatment and an ability to stay active despite her reports of pain.  For example, she went with her husband to drop off and pick up her children from school and other activities; went to the YMCA for swimming and low-impact workouts; and went on a week-long road trip with her family in June 2018.

S.J.B. was sent for a variety of testing to evaluate her pain and ambulation issues.  A magnetic resonance image ("MRI") of the lumbar spine in June 2018

4

showed mild findings, and an updated MRI in April 2019 showed mild degenerative disc disease and minimal changes at one level of her lumbar spine. An electromyography/nerve conduction study performed that same month showed "essentially normal" results. Aplt. App. vol. III at 637. In August 2021, a neurological examination showed normal strength and an intact gait.

The record contained conflicting evidence about S.J.B.'s gait and motor function. Some examinations showed normal leg strength or gait, while at other times she exhibited reduced leg strength and an antalgic gait. There was also conflicting evidence concerning her limitations stemming from her lower back impairment. S.J.B.'s primary care physician, Dr. Paul Cump, completed forms indicating she required assistance walking, could not stand or lift anything, and had episodic restrictions preventing her from typing, sitting, standing, walking, and lifting. Similarly, S.J.B.'s physical therapist, Karen Humphrey, reported S.J.B. could sit for only 30 minutes, could stand for only five minutes, and could walk only 126 feet in two minutes. By contrast, state agency medical experts, Dr. David Gillum and Dr. Kimberlee Terry, reviewed the medical records and opined that S.J.B. remained capable of a range of seated light work with postural limitations.

## B.  Administrative Proceedings and District Court Judgment

In her May 2023 decision, the ALJ followed the five-step sequential evaluation process for the consideration of disability claims. *See Wall*, 561 F.3d at 1052 (summarizing steps). At step one, the ALJ determined that S.J.B. is not presently

5

engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) ("If you are doing substantial gainful activity, we will find that you are not disabled.").

At step two, the ALJ considers whether the claimant has "a medically severe impairment or impairments," such that the claimant's physical or mental ability to perform basic work activities is "significantly limit[ed]." *Id.* (internal quotation marks omitted). In S.J.B.'s case, the ALJ found she had several severe impairments, including lower back and digestive impairments, but that her urinary incontinence was not severe. The ALJ proceeded to step three and determined none of S.J.B.'s impairments amounts to a condition in the appendix of the relevant disability regulation. *See Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004).

The ALJ then proceeded to step four to determine S.J.B.'s residual functional capacity ("RFC"). *See* 20 C.F.R. § 404.1545(a)(1), (a)(4) (defining RFC as "the most [the claimant] can do despite [her] limitations"). In doing so, the ALJ considered all of S.J.B.'s impairments, including those the ALJ determined were not severe. *See id.* § 404.1545(a)(2) (the ALJ "will consider all [the claimant's] medically determinable impairments . . . including [those] that are not severe").

The ALJ found at step four that S.J.B. possessed the RFC to return to her past sedentary work as an accounting clerk, and additionally found at step five that S.J.B. also had the RFC to perform a range of seated light work that existed in significant numbers in the national economy. The ALJ therefore concluded S.J.B. was not disabled.

The Appeals Council denied S.J.B.'s request for review. She then appealed to the district court, which affirmed. S.J.B. appeals, arguing the ALJ erred because the RFC failed to account for her digestive and urinary impairments, and because the ALJ erred in finding she did not require the use of an assistive device.

## II. Discussion

### A. Standard of Review

"We review the district court's decision de novo and independently determine whether the ALJ's decision is free from legal error and supported by substantial evidence." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted). This "threshold . . . is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994). We may neither reweigh evidence nor substitute our judgment for the Commissioner's. *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014).

### B. The ALJ's Evaluation of S.J.B.'s Digestive Impairments

S.J.B. argues the ALJ erred because the RFC failed to adequately account for her digestive impairments. We disagree.

The ALJ found S.J.B.'s Crohn's disease and irritable bowel syndrome to be severe impairments at step two, then analyzed the evidence relating to those conditions in determining her RFC. The ALJ noted S.J.B.'s testimony that Humira

7

had worked "perfectly" for her Crohn's disease. Aplt. App. vol. X at 2737; *see id.* at 2771 (S.J.B.'s testimony that "Humira . . . has worked perfectly"). The ALJ also reviewed evidence showing S.J.B.'s digestive impairments were largely controlled with treatment. While the ALJ acknowledged S.J.B. experienced an increase in symptoms in early 2019, her condition was improved with budesonide therapy. Similarly, the ALJ noted S.J.B. reported an increase in symptoms in October 2020 after she stopped taking Humira, but she asked to restart the medication. The ALJ found the medical record reflected no further changes in S.J.B.'s symptoms until August 2021, when S.J.B.'s provider indicated she was experiencing a possible flare. But the provider also noted S.J.B. was still responding favorably to weekly Humira and daily mesalamine. Taking this evidence into account, the ALJ concluded S.J.B. had the RFC to perform a range of seated light work.

There was evidence indicating more severe work limitations due to S.J.B.'s digestive impairments, which the ALJ also considered. In particular, the ALJ considered a February 2019 medical opinion from Dr. Baker, S.J.B.'s gastroenterologist. He filled out a form indicating that S.J.B.'s digestive symptoms would severely limit her ability to sit, stand, walk, and lift (e.g., sitting and standing/walking for less than two hours in an eight-hour work day); that her symptoms would frequently interfere with her attention and concentration; and that she would be absent from work more than three times per month. The ALJ found Dr. Baker's opinion unpersuasive, however, because it was not supported by his own

8

treatment notes showing that her symptoms were largely controlled by medication.[2] *See White v. Barnhart*, 287 F.3d 903, 907 (10th Cir. 2001) (affirming ALJ's disregard of treating physician's opinion based on discrepancies between physician's opinion and observations during examination). In addition, the ALJ noted that two state agency medical experts opined, in contrast to Dr. Baker, that S.J.B.'s limitations were consistent with a range of seated light work. *See* 20 C.F.R. § 404.1520c(c)(2) (persuasiveness of a medical opinion correlates with its degree of consistency with evidence from other medical sources).

S.J.B. argues the RFC was not supported by substantial evidence for two reasons. First, she contends the workplace limitations the ALJ adopted were not rationally related to her digestive impairments. The ALJ stated she accounted for S.J.B.'s digestive impairments by limiting her to seated light work with restrictions, including multiple postural restrictions and restrictions on walking, standing, and sitting. S.J.B. contends these restrictions are unrelated to digestive impairments, but Dr. Baker—on whose opinion she otherwise heavily relies—acknowledged that S.J.B.'s digestive symptoms could restrict her ability to sit, stand, walk, and lift or carry. The ALJ found Dr. Baker's more restrictive limitations for S.J.B. unsupported, but Dr. Baker's acknowledgment of a connection between S.J.B.'s digestive symptoms and exertional capacities nonetheless underscores that the

---

[2] In addition, the ALJ noted that, in rendering his opinion, Dr. Baker had relied upon a functional capacity evaluation that, for reasons discussed in Part II.D., the ALJ found unpersuasive.

workplace limitations adopted by the ALJ are rationally related to S.J.B.'s digestive impairments.

Second, S.J.B. notes the existence of other evidence in the record that would support additional limitations arising from her digestive impairments, including her own testimony, third-party statements, and her overall course of treatment. That the ALJ resolved this conflicting evidence unfavorably to S.J.B. does not mean it was ignored. Indeed, the ALJ weighed this evidence and addressed it in her decision. *See* Aplt. App. vol. X at 2737-38 (discussing hearing testimony); *id.* at 2741 (discussing medical treatment for digestive impairments); *id.* at 2748 (discussing third-party statements). We may not reweigh the same evidence, *see Hendron*, 767 F.3d at 954, nor does it overwhelmingly contradict the evidence the ALJ relied on, *see O'Dell*, 44 F.3d at 858.

In short, the record reflects the ALJ considered the evidence of S.J.B.'s digestive impairments and accounted for them explicitly. *See* Aplt. App. vol. X at 2741 (after discussing the conflicting evidence, stating that the ALJ "ha[d] accounted for [S.J.B.'s] gastroenterology impairments in limiting her to reduced light exertion in addition to the postural and other limitations in the assessed [RFC]"). Having carefully weighed the conflicting evidence, the ALJ reasonably found that the record supported an RFC consistent with a range of seated light work.

## C. The ALJ's Evaluation of S.J.B.'s Urinary Incontinence

S.J.B. similarly argues the ALJ erred because the RFC failed to account for her urinary incontinence. We disagree.

10

The ALJ noted record evidence that S.J.B. had mixed urinary incontinence in August 2020 and reported wearing a bladder control pad during that time.  Although the ALJ found this condition non-severe at step two, the ALJ nevertheless considered it in evaluating her RFC.  The ALJ noted S.J.B. told providers she changed her pad two to three times in an eight-hour period.  The ALJ therefore found she could perform seated light work with normal breaks.  In support of this finding, the ALJ explicitly relied on S.J.B.'s own symptom log.  Aplt. App. vol. X at 2742 (citing *id.* vol. VIII at 2226).  The ALJ found S.J.B.'s urinary incontinence did not require additional work limitations in the RFC.  Substantial evidence supports this finding.

S.J.B. argues that the ALJ erred in finding her urinary incontinence not severe at step two.  But because the ALJ found several other severe impairments at step two—including her digestive impairment and lower back problems—any such error would be harmless.  *See Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) ("[T]he failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is severe.").

S.J.B. also argues the ALJ erred in relying on her own reports of how often she needed to change her bladder pad because the record does not establish whether a pad "functions with 100% reliability."  Opening Br. at 16.  But even accepting the possibility that her bladder pad was less than one hundred percent reliable, that alone does not overwhelmingly contradict the evidence on which the ALJ relied.  *See O'Dell*, 44 F.3d at 858.

**D.  The ALJ's Evaluation of S.J.B.'s Need for an Assistive Device**

Finally, S.J.B. argues the ALJ erred in finding she does not require the use of a wheelchair or other assistive device.  Again, we disagree.

For an assistive device to be required, "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed."  Soc. Sec. Ruling ("SSR") 96-9p, 1996 WL 374185, at *7 (July 2, 1996).  Substantial evidence supports the ALJ's finding that the record does not establish such a need. The ALJ noted S.J.B. began treatment for sudden-onset back pain in May 2018 and continued to receive pain management and physical therapy through her date last insured.  Still, the ALJ observed that while S.J.B. had some pain with range of motion and at times had an antalgic gait, she exhibited normal gait and strength during other examinations.[3]  The ALJ noted, for example, that in August 2021, a neurological examination showed normal strength and an intact gait.  In addition, the ALJ noted that in April 2019, an MRI showed only mild to moderate degenerative changes in S.J.B.'s lower spine, and an electromyography/nerve conduction study of both legs returned "essentially normal" results.  Aplt. App. vol. X at 2740 (quoting *id.* vol. III at 637).  The ALJ also considered the opinions of state agency medical experts.  The ALJ found persuasive

---

[3] S.J.B. contends evidence of an antalgic gait, by itself, establishes the need for an assistive device.  But the record reflects that she was observed with an antalgic gait without the use of any assistive device.  And at any rate, as noted above, there are records showing that on other occasions she had a normal gait.

their opinions that S.J.B. remained capable of a range of seated light work with postural limitations because they were supported by and consistent with the overall record. Based on this evidence, the ALJ reasonably concluded that S.J.B. did not need an assistive device.[4]

S.J.B. contends the ALJ ignored contrary evidence, in particular a functional capacity evaluation by S.J.B.'s physical therapist, Ms. Humphrey, and the assessments of S.J.B.'s primary care physician, Dr. Cump. But the ALJ explicitly considered this evidence in her opinion. Ms. Humphrey reported S.J.B. could sit for only 30 minutes and stand for five minutes and could walk only 126 feet in two minutes. The ALJ discounted that assessment, however, because she factored in S.J.B.'s subjective reports and self-limiting behavior, she did not perform multiple tests, and her assessment was inconsistent with her other physical examinations of S.J.B. through 2021. Thus, the ALJ did not ignore Ms. Humphrey's evaluation. That the ALJ resolved this contrary evidence unfavorably to S.J.B. does not mean it was ignored.

The ALJ also considered Dr. Cump's assessments. Dr. Cump opined that S.J.B. could not walk more than 20 feet without rest or reach above her neckline without assistance, and that she required assistance walking, had poor balance, and used a cane, walker, wheelchair, or assistance from her husband to move. He also completed a form

---

[4] S.J.B.'s counsel insists the ALJ relied heavily on a treatment note about S.J.B. walking at Walmart and surmises that she could have been walking with the aid of a grocery cart. We cannot agree. As described above, the ALJ relied on the totality of the evidence—including S.J.B.'s diagnostic test results, physical examinations, and medical source opinions—in concluding that S.J.B. did not need an assistive device.

for S.J.B.'s employer in which he said she could not stand or lift anything and had episodic restrictions preventing her from typing, sitting, standing, walking, and lifting. The ALJ considered Dr. Cump's assessments but found them unpersuasive because they were unsupported by objective medical evidence and contradicted the weight of the evidence. Moreover, there was no indication Dr. Cump had ever prescribed S.J.B. assistive aids. We reject S.J.B.'s contention that the ALJ ignored Dr. Cump's assessments. The ALJ weighed the evidence, including Dr. Cump's assessments, and we may not reweigh it.

### III. Conclusion

We affirm the district court's judgment.

Entered for the Court

Veronica S. Rossman
Circuit Judge